**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | | |
|---|---|---|
| **CORNELIUS MCCALL,** | : | |
| 4318 Penn Avenue | : | |
| Nottingham, MD  21218 | : | |
| | : | **CIVIL ACTION NO.** |
| **SZE ANSON NG**, | : | **JURY TRIAL DEMANDED** |
| 4998 Key Lime Drive | : | |
| Unit 302 | : | |
| Jacksonville, FL  32092 | : | |
| | : | |
| **JAYDA PEARSON,** | : | |
| 4304 Wentworth Road | : | |
| Gwynn Oak, MD 21207 | : | |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| **NEURO MONITORING** | : | |
| **TECHNOLOGIES, INC.,** | : | |
| 3060 Washington Road | : | |
| Suite 268 | : | |
| Glenwood, MD 21738 | : | |
| | : | |
| Serve:      Resident Agent | : | |
| Richard Mathabel | : | |
| 3060 Washington Road | : | |
| Suite 268 | : | |
| Glenwood, MD 21738 | : | |
| | : | |
| **RICHARD MATHABEL**, individually, | : | |
| 3060 Washington Road | : | |
| Suite 268 | : | |
| Glenwood, MD  21738 | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## COMPLAINT

**COMES NOW**, Cornelius McCall ("Mr. McCall"), Sze Anson Ng ("Ms. Ng") and Jayda

Pearson ("Ms. Pearson")(collectively "Plaintiffs"), by and through their undersigned counsel,

and hereby bring this Complaint against Neuro Monitoring Technologies, Inc., and Richard

Mathabel ("Mr. Mathabel")(collectively "Defendants"), by averring as follows:

## INTRODUCTION

1.      The present lawsuit addresses the failure of Defendants to pay all wages earned

by Plaintiffs, the brazen wage theft orchestrated by Defendants and the extortionist scheme to

force employees to remain captive employees of Defendants or suffer great debt.  The overall

plot set in place by Defendants is so unconscionable and overreaching as to smack of the

imposition of involuntary servitude and human trafficking.  In this scheme, Plaintiffs (who were

young low-level employees making just over minimum wage), were forced to sign an

unconscionable contract at the time of their hire which, though identified as at-will employees,

required them to stay a length oof time or be forced to *repay* all the wages they earned, all

benefits received and to pay Defendant's portion of federal and state tax, in addition to other

sums.  When these employees left their so-called at will employment with Defendants,

Defendants immediately and aggressively demanded large sums from these employees, including

demand letters and lawsuits.

2.      Defendant employer has since instituted suit against Mr. McCall and Ms. Ng in

the District Court for Howard County seeking $15,000 dollars because neither of them would

repay their earned wages, earned benefits and Defendant's portion of federal and state tax

contributions.  These lawsuits are styled *Neuro Monitoring Technologies v. McCall, Case No.:*

*D-101-CV-21-009883* and *Neuro Monitoring Technologies v. Ng, Case No.: D-101-CV-21-*

*009884*, respectively.  These lawsuits remain pending and no trial has taken place.  On

September 3, 2021, Ms. Pearson was forwarded a letter from a law firm representing Defendant

employer also threatening legal action if she failed to return all earned wages, earned benefits,

and Defendants' portions of the federal and state tax contributions.

3.     The net effect of Defendants appalling shakedown is to have Plaintiffs not only work for free but be indebted to the employer for additional liquidated damages simply because of leaving their employment, a position that was non-exempt, low paying and purportedly, at will.  Under these circumstances, the employer's actions are in clear violation of the most basic provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*., ("FLSA"); and/or the Maryland Wage and Hour Laws, MD. CODE, LAB. & EMPL. § 3-501 *et seq*. ("MWHL") requiring employees to be paid for time worked.[1]  In addition, the scheme implemented to force employees to stay or suffer serious financial repercussions runs afoul of the Trafficking Victims Protection Act ("TVPA").  18 U.S.C. § 1589(a)(2)-(3).

4.     This action brings claims by the Plaintiffs for unpaid regular and overtime wages, and for record keeping and wage hour infractions in violation of the FLSA, MWHL, and/or the Maryland Wage Payment and Collection Laws, MD. CODE, LAB. & EMPL. § 3-501, *et seq*. ("MWPCL"), along with enhanced damages, pre and post-judgment interest, reasonable attorneys' fees and costs, and other relief as these causes permit.  Alternatively, Plaintiffs assert common law claims for *quantum meruit*.

5.     Plaintiffs seek a declaratory adjudication finding that the repayment and liquidated damages provisions in the contracts at issue are unenforceable, against public policy, illegal, in violation of the FLSA, MWHL, MWPCL, and the TVPA.

---

[1]  Defendant Neuro Monitoring Technologies, Inc. received approximately 1.2 million dollars in taxpayer funded PPP loans and used a portion of these monies to make payroll to Plaintiffs.  In fact, several payroll entries for these employees are denoted as "PPP salary."  Plaintiffs anticipate filing additional claims related to fraud in the use of such funds tethered to these extortionist employment practices.

6.     These claims and the facts in support are referred to individually or, at times, collectively as the "Lawsuit."

## PARTIES

7.     Mr. McCall is a 29 year old resident of the State of Maryland.  At all relevant times to this Lawsuit, Mr. McCall was an "employee" within the meaning of the FLSA, MWHL, and the MWPCL.

8.     Ms. Ng is a 23 year old adult resident of the State of Florida.  At all relevant times to this Lawsuit, Ms. Ng was an "employee" within the meaning of the FLSA, MWHL, and the MWPCL.

9.     Ms. Pearson is a 23 year old adult resident of the State of Maryland.  At all relevant times to this Lawsuit, Ms. Pearson was an "employee" within the meaning of the FLSA, MWHL, and the MWPCL.

10.     Defendant Neuro Monitoring Technologies, Inc. (hereinafter "NMT") is a for-profit corporation formed and organized under the laws of the State of Maryland.  NMT holds itself out as the leading provider of intraoperative neuromonitoring services in the Mid-Atlantic region and boasts that it provides an assortment of staff and services which support more than 54 hospitals and hundreds of physicians in the Mid-Atlantic region.  NMT maintains its primary office and principal place of business at 3060 Washington Road in Glenwood, Maryland.

11.     NMT is engaged in the production of goods for interstate commerce and/or uses and handles goods that have moved in interstate commerce as such terms are defined in the FLSA and is an "employer" subject to the FLSA, MWHL, and the MWPCL within the meaning of those statutes.

12.     Defendant Mr. Mathabel is, upon information and belief, a resident of the State of Maryland.   Mr. Mathabel is the President of NMT who operates, directs, and/or manages NMT. Mr. Mathabel controlled, oversaw, and set the terms and conditions of employment for Plaintiffs, including the employment agreement foisted upon Plaintiffs after they were offered and accepted the position with Defendants.  Mr. Mathabel directed to withhold wages earned from Plaintiffs. Mr. Mathabel authored a letter of extortion demanding repayment of wages, benefits and Defendants' portion of federal and state tax contributions and liquidated damages.  He then directed and authorized the filing of lawsuits against Mr. McCall and Ms. Ng in the District Court for Howard County, Maryland, as well as the legal collection letter sent to Ms. Pearson.

13.     In addition, Mr. Mathabel is the resident agent for NMT and, upon information and belief, is the owner and alter ego of NMT and/or otherwise are individually liable as an "employer" as the term is defined by the FLSA, MWHL and the MWPCL.   Alternatively, Mr. Mathabel acted through unified operation and/or common control with NMT and/or constituting an "enterprise" within the meaning of the FLSA 29 U.S.C. § 203(r)(1).

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this Lawsuit pursuant to 28 U.S.C. § 1331, as this action is being brought under the FLSA, TVPA and Declaratory Judgment Act, 28 U.S.C. §§ 2201.  The Maryland statutory and common law claims set forth herein are so related and intertwined with the federal claims so as to form a part of the same case and controversy and vests this Court with supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

15.     All Plaintiffs have signed a consent form to pursue this Lawsuit and assert claims arising under federal and state law, which are collectively attached hereto as Exhibit 1.

16.     Venue is proper in the Baltimore Division of the United States District Court for the District of Maryland under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this Lawsuit occurred in this District, and because NMT conducts business and maintains its principal place of business in Howard County, Maryland.

## FACTS

### NMT's Targeting and Recruiting Preferences

17.     NMT purposely targets young, inexperienced graduating seniors from college with promises of a lucrative career and benefits.

18.     For example, NMT's job description for the position of Neurophysiological Clinician makes promises of a "long term career in health services" with benefits such as health insurance, 401(k) retirement plan, expense reimbursement and related benefits.   NMT does not require any experience for the position, and the only required qualifications are a drivers' license and bachelors' degree in health sciences.

19.     NMT further targets and reaches out to local colleges and universities to get buy-in and assistance with recruiting of students.   NMT regularly communicates with professors and job placement officials at colleges such as Towson University.  These institutions, upon information and belief, are unaware of NMT's intentions and fraudulent, illegal practices towards their students once hired.  These colleges are, nevertheless, complicit in NMT's recruiting and hiring practices.

20.     For example, on or about October 14, 2020, a clinical professor in Towson University's Kinesiology Department sent a mass email to all exercise science students with NMT's job description and extolling the "great opportunity"  that the position offered.  The

email strongly encourages the student to apply and states that that "[t]his Company has hired quite a few of our graduates."

21.     Students like Ms. Pearson relied upon such recommendations and thereafter applied for and underwent job interviews for the position of Neurophysiological Clinician. During the interview, no mention was made of the fact that the applicant would be required to sign a contract requiring them to return all earnings, pay back all benefits earned, pay Defendants' portion of its federal and state tax contributions, and/or pay liquidated damages if they left NMT.

<u>Contract Provision at Issue</u>

22.     After accepting employment, Plaintiffs were each, required to sign an employment agreement ("Contract").  None of the plaintiffs had the opportunity to meaningfully review or seek the advice of counsel with regard to the Contract and were not in an equal bargaining position with NMT in relation to the Contract.

23.     The Contract for each Plaintiff contained the following relevant language pertaining to liquidated damages:

> 2.7 <u>Liquidated Damages</u>.  Employee hereby agrees and acknowledges that intraoperative neurosurgical monitoring is a highly-specialized discipline that requires significant training, including, without limitation, the training required to obtain a CNIM; that employee has no prior specialized training in intraoperative neurosurgical monitoring and does not have a CNIM as of the date hereof; that Company will be providing to Employee training related to his work, including, without limitation, the training required to obtain a CNIM during the initial portion of the term of this Agreement; that Company will recoup its initial training investment in Employee during a two-year period from and after the date when he receives his CNIM; and that Company accordingly will suffer economic losses from its employment of Employee if Employee's employment with Company is terminated before the second anniversary of his receipt of the CNIM.  The parties accordingly hereby agree that, if Employee's employment with Company is terminated at any time prior to the date of his receipt of the CNIM or the one-year anniversary of the date when he receives his CNIM (the "Anniversary"), the actual damages incurred by Company would be difficult to estimate in advance and to prove after such a termination occurs, and Company therefore will be entitled to liquidated damages in an amount equal to fifteen thousand and 00/100 dollars ($15,000.00)..., which

amounts the parties agree are not penalties but rather as of the date hereof are a reasonable and fair approximation of the damages that would be incurred by Company in the event of such a termination.

<u>Hiring; Non-Payment for Training</u>

24.     Mr. McCall began full time employment with NMT on or about January 13, 2021 as a Neurophysiological Clinician.

25.     Ms. Ng began full time employment with NMT on or about January 18, 2021 also as a Neurophysiological Clinician.

26.     Ms. Pearson began full time employment with NMT on or about May 24, 2021 also as a Neurophysiological Clinician.

27.     Prior to their assigned start dates, Jessica Stein ("Ms. Stein"), an employee of NMT, required each of the respective Plaintiffs to complete approximately 6-10 hours of online training and credentialing to work at the hospitals where Plaintiffs would be working.  NMT did not compensate Plaintiffs for this work, in violation of state and federal wage and hour laws.

<u>Primary Duties</u>

28.     At the time of their hiring, Plaintiffs reported to their assigned trainers as well as Peter Bogush ("Mr. Bogush") and Terry Erb ("Ms. Erb"), who handled scheduling and other administrative matters at the direction of Mr. Mathabel.  NMT's manual identified Messrs. Bogush and Mathabel as primary and required contacts for schedule clarifications, cancellations, or advice.

29.     As Neurophysiological Clinicians, Plaintiffs were tasked with providing neurophysiological monitoring services, including intra-operative monitoring, and to perform such other tasks and duties as may be assigned.

30.     At the time of their hire, Plaintiffs were assigned to more senior and experienced Neurophysiological Clinicians and instructed to mirror them as part of their basic on- the –job training.

31.     Mr. McCall was assigned to a clinician named Julie Frye ("Ms. Frye"). Ms. Ng was assigned to Margaret Palmer ("Ms. Palmer").  Ms. Pearson was assigned to Bailey Schaefer ("Ms. Schaefer").

32.     Plaintiffs' primary duties as Neurophysiological Clinicians were largely manual in nature and involved driving to and from hospitals and other places performing monitoring services.  While in the presence of and at the direction of their senior clinicians, licensed surgeons, physicians and health care providers, Plaintiffs would observe and/or assist with placing monitoring patches on patients, then watching  monitoring equipment and communicating what was displayed on the monitoring equipment to the surgeons, physicians and health care providers as the case may be.  As such, Plaintiffs' duties did not involve the exercise of meaningful discretion or independent judgment with regard to important business matters. These positions are non-exempt positions and are low paying hourly positions.

Classification and Rate of Pay

33.     At the time of their hire, Plaintiffs were each classified as full-time salaried non-exempt employee earning $25,000 dollars annually.

34.     Plaintiffs' salaries were based upon a 40 hour working schedule of Monday through Friday, 8 hours per day.  Based on their salaries, Plaintiffs' regular rate of pay equated to $12.00 dollars per hour worked,[2] with an overtime rate of pay of $18.00 dollars per hour worked. These hourly rates of pay were confirmed by NMT's counsel in a letter dated June 15, 2021.

---

[2]  The applicable Maryland minimum wage during this period was $11.75 dollars per hour.

<u>Failure to Record Hours Worked</u>

35.     Throughout Plaintiffs' respective employment, NMT failed to accurately record the hours worked by Plaintiffs in each work week and did not have a system in place to accurately record Plaintiffs' time spent performing work for the benefit of NMT.

36.     Each of the Plaintiffs was told by Mr. Bogush and/or others that it was not necessary to record their time or hours worked because they were "on salary," and were expected to work as many hours necessary to discharge the duties required of their positions.

37.     NMT violated the FLSA and Maryland wage and hour laws by failing to make, keep and preserve accurate records of hours that each of the Plaintiffs worked during each day and in each workweek during their respective employment.

<u>Additional At-Home Evening Duties</u>

38.     In addition to their day-to-day onsite duties as Neurophysiological Clinicians in training, Plaintiffs were required to and instructed by NMT to perform work each night to prepare for the following day of work.  These duties and requirements included, but were not limited to, studying guides and books, watching CEU lectures and word documents on surgical procedures, reviewing work sheets and taking associated quizzes, and preparing and marking down where needles/patches were to be placed for monitoring each surgical procedure for the following day.

39.     In addition, all Plaintiffs were physically tasked and required each night while at home to tie needles for patient procedures the next day and other related tasks.

40.     Throughout their employment, Plaintiffs devoted approximately 10-20 hours of additional time at home performing physical tasks, studying and other or other preparation each work week.  In addition, Plaintiffs devoted approximately 4-5 each weekend during their

employment performing similar tasks.

41.     NMT was aware that Plaintiffs performed additional duties in the evening and suffered and permitted all Plaintiffs to work in excess of 40 hours in certain weeks throughout their employment.

<u>Willful Refusal to Pay Overtime</u>

42.     As non-exempt employees, Plaintiffs were each entitled to receive overtime pay for each hour worked each week in excess of 40 hours in any workweek as required under the FLSA and MWHL.

43.     Despite this, Plaintiffs were each specifically informed at the time of their hire by Mr. Bogush and by others that NMT does not pay overtime pay to employees who are undergoing what they deem to be "training," even if employees suffer or are permitted to work in excess of 40 hours in any work week.

44.     Defendants knew that Plaintiffs performed additional duties at home each night that required overtime pay, but nevertheless violated wage and hours laws by failing to pay for such overtime work.

45.     Subject to review of NMT's records, Plaintiffs are owed overtime pay for the additional duties performed for the benefit of NMT throughout their employment, not including enhanced damages and other relief which are sought herein.

<u>Non-Compensation of Driving Time</u>

46.     Additionally, throughout their employment Plaintiffs were at times required to drive to the office before the start of work to pick-up electrodes and supplies before reporting to their assigned hospital. Similarly, Plaintiffs were required to drive to the office after work to pick-up electrodes and supplies or to perform other duties before returning home.

47.     Plaintiffs were not credited for such driving time from the office to the hospitals and vice-versa as required by state and federal wage and hour laws, nor did NMT have a system in place to record their full working hours.

48.     Plaintiffs were not credited for such driving time between different hospitals in the course and scope of their employment in any one work-day, nor did NMT have a system in place to record their full working hours.

49.     Subject to review of NMT's records, Plaintiffs are owed overtime pay for the driving time incurred for the benefit of NMT throughout their employment, not including enhanced damages and other relief which are sought herein.

<u>Separation of Employment - McCall</u>

50.     On April 8, 2021, Mr. McCall resigned from NMT due to a health condition that was aggravated by the working conditions, and formally separated his employment.

51.     NMT did not pay Mr. McCall for six accrued and payable personal days upon his separation or the outstanding overtime owed at the time of his separation or within the next scheduled payroll period, as required by federal and state wage and hour laws.

<u>Separation of Employment- Ng</u>

52.     On April 25, 2021, Ms. Ng resigned from NMT and formally separated her employment.

53.     Upon giving notice that she was resigning, Mr. Mathabel contacted Ms. Ng and demanded that she remain employed and not leave NMT.   Ms. Ng responded that she had to leave as she lived with her parents who were moving to Florida and did not make enough to afford her own apartment.

54.     Ms. Ng's response angered Mr. Mathabel, and he threatened to sue her for

liquidated damages and stated to Ms. Ng: "well you signed a contract and you're gonna have to pay 15k to me."  When she explained she did not have such monies, Mr. Mathabel retorted "that's your problem" and "you'll just have to figure that out," or words to the effect.

54.     After this conversation, NMT willfully did not pay her salary for her last week of work or her accrued vacation, and did not pay her submitted expenses upon her separation of employment.  NMT also did not pay Ms. Ng's unpaid and outstanding overtime owed at the time of her separation or within the next schedule payroll period, as required by federal and state wage and hour laws.

Separation of Employment- Pearson

56.     On August 16, 2021, Ms. Pearson resigned from NMT due to a health condition caused by the workplace environment and formally separated her employment.

57.     NMT did not pay Ms. Pearson for nine accrued personal days upon her separation, did not pay her outstanding overtime owed at the time of her separation or within the next scheduled payroll period as required by federal and state wage and hour laws, and did not reimburse her for expenses.

Demand for Disgorgement of Wages, Repayment of Expenses, and Liquidated Damages

58.     In or around April of 2021, Mr. Mathabel personally sent letters to Mr. McCall and Ms. Ng demanding payment for all wages earned wages, earned benefits, Defendants' portion of required tax contributions, and other so-called expenses.

59.     Mr. Mathabel's letter to Mr. McCall dated April 12, 2021 contained a specific detailed chart demanding the immediate repayment of the following categories/sums:

| Category | Amount |
|---|---|
| Employee Trainee Salary 1/13/2020 – 3/31/2021 | 5,492.42 |
| Employer Company Paid Payroll Taxes 1/13/2020 – 3/31/2021 | 486.07 |
| | |
| Auto Reimbursement | 245.45 |
| Cell Phone Reimbursement | 150.00 |
| Office Supply Reimbursement | 279.77 |
| Parking Reimbursement | 207.00 |
| Vendex Scrub Credits | 125.00 |
| CPR Certification | 64.00 |
| | |
| Annual Credential Subscriptions | 319.00 |
| Background Check | 40.00 |
| Drug Screen | 110.00 |
| | |
| **Total:** | **$7,518.71** |
| | |

60.     Similarly, when Ms. Pearson gave notice to NMT of her resignation from employment, she was contacted by Ms. Stein and threatened with litigation if she did not pay these amounts.

61.     Ms. Stein sent Ms. Pearson an email containing a specific detailed chart demanding the immediate payment of the following categories and sums:

| Category | Amount |
|---|---|
| Employee Trainee Salary 5/24/2021 – 8/15/2021 | 5776.53 |
| Employer Company Paid Payroll Taxes 5/24/2021 – 8/15/2021 | 603.64 |
| | |
| Auto Reimbursement | 529.71 |
| Cell Phone Reimbursement | 250.00 |
| Parking Reimbursement | 471.00 |
| Vendex Scrub Credits | 54.00 |
| | |
| Annual Credential Subscriptions | 319.00 |
| Background Check | 40.00 |
| Drug Screen | 58.00 |
| | |
| **Total:** | **$8,101.88** |
| | |

62.     Ms. Stein followed up with a call to Ms. Pearson demanding the payment of the amounts specified in the chart, coupled with the threat that NMT would pursue 15k in liquidated damages if she did pay the sums immediately.

63.     On September 3, 2021, collection counsel for NMT sent Ms. Pearson a demand of $8,101.88 dollars under threat of imminent litigation and threats to seek up to $15,000 dollars in liquidated damages if a lawsuit were filed.

64.     Defendants and their agents and alter-ego demanded disgorgement of earned wages, earned benefits and even payment of Defendants' own tax obligations.

65.     Through their actions, Defendants were demanding that Plaintiffs' work without pay, pay for Defendants' own tax obligations, and pay for Defendants' overhead costs.  In short, Defendants believe that Plaintiffs were indentured servants who owed the "master" for their work.  All of this is in violation of the laws that were passed to ensure that workers were treated as employees, not servants.  At a minimum, this scheme is in violation of the FLSA, MWHL, and MWPCL, which require the payment of wages for work performed.

66.     Not only did NMT receive PPP funds, but it bills for services it provides.  NMT's scheme is set out to allow it to enrich itself in all aspects.  It bills for services supported by Plaintiffs, it received tax funded money to pay its employees, some of which has already been forgiven from repayment obligations, and it seeks to get all wages returned, plus additional amounts.  This scheme contorts the very concept of employment on its head, requiring the employee to stay employed, as an at-will employees, or suffer great indebtedness.

67.     NMT received approximately 1.2 million dollars in taxpayer funded PPP loans and grants.  The amounts received in 2020 were forgiven.  PPP was used for Plaintiffs' payroll and costs attendant to employment.  Several payroll entries for these employees are denoted as

"PPP salary." In seeking to extort the return of wages, additional amounts, and liquidated damages, NMT was further attempting to fraudulently obtain windfall while placing Plaintiffs in debt.

<u>Demand For Unpaid Wages/ Cease and Desist- McCall</u>

68.     On or about May 28, 2021, Mr. McCall, through counsel, formally notified NMT that it had failed to pay all accrued personal days owing at the time of separation, as well as the fact that there was significant overtime owed.  Further, the letter demanded that NMT cease-and-desist from further harassing Mr. McCall and seeking illegal repayment of his earned wages and/or liquidated damages.

69.     The letter forwarded on behalf of Mr. McCall afforded NMT the opportunity to cease its illegal practices and cure the unpaid wage violations.

70.     While NMT thereafter belatedly paid Mr. McCall for 6 personal days and 3.27 hours of overtime, it purposefully and willfully did not pay him the full measure of overtime owed as alleged in this Lawsuit.

<u>Frivolous Lawsuits Against Plaintiffs</u>

71.     On July 16, 2021, NMT and Mr. Mathabel doubled- down on their threats of extortion and filed patently frivolous lawsuits against Plaintiffs seeking $15,000 dollars in liquidated damages in the District Court of Howard County.

72.     These lawsuits are styled *Neuro Monitoring Technologies v. McCall, Case No.: D-101-CV-21-009883* and *Neuro Monitoring Technologies v. Ng, Case No.: D-101-CV-21-009884*, respectively.

73.     The lawsuits are pending and no trial has taken place as of the filing of this Lawsuit.  Similarly, litigation has been threatened against Ms. Pearson and based on the threats

contained in the letter by NMT's collection counsel, litigation is imminent.

74.     The liquidated damages provision in the respective Contracts are illegal, unconscionable, unenforceable, violate federal and state wage and hour laws, and are otherwise against the public policy of the state of Maryland.

75.     As with any employment, however low paying, Plaintiffs positions included a training period.  NMT provided on the-job-training and in-house training only as part of the training.

**COUNT I**
**FAIR LABOR STANDARDS ACT**
(All Defendants)

76.     Plaintiffs incorporate by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

77.     At all times relevant to this Lawsuit, Defendants were "employers" and Plaintiffs were "employees" within the meaning of the Fair Labor Standards Act ("FLSA").

78.     At all times relevant to this Lawsuit, Mr. Mathabel had the power and control necessary to cause NMT to take actions pertaining to implementation and approval of payroll practices and the fraudulent repayment and recovery scheme, as well as Defendants' failure to pay Plaintiffs the required wages and overtime rate of pay for hours worked in excess of 40 hours per workweek and more thoroughly detailed in this Lawsuit.

79.     Mr. Mathabel had the power to hire and fire employees, including Plaintiffs.  He controlled Plaintiffs' terms and conditions of employment.

80.     Plaintiffs were covered, non-exempt employees under the FLSA and its implementing regulations and, as such, were entitled to be paid wages and overtime pay for all hours worked consistent with the requirements of the FLSA.

81.     Defendants willfully and/or intentionally failed and/or repeatedly refused to pay to Plaintiff all wages and overtime wages due and owed under the FLSA for the period set forth in this Lawsuit.

82.     Defendants' actions and inactions were in willful disregard of the rights of Plaintiffs under the FLSA, and not the result of a good faith or bona fide dispute.  Because of Defendants' actions and inactions, Plaintiffs suffered a loss of wages.

83.     Plaintiffs are owed unpaid wages and overtime wages by Defendant as allowed under 29 U.S.C. §§ 206 and 207 in an amount consistent with the allegations herein, or as the result of a review of Defendants records and at the trial of this action.

84.     In addition to any judgment awarded for wages and overtime wages, Plaintiffs are entitled to an award of liquidated damages equal to the amount of damages, in addition to pre and post-judgment interest, costs of the action, and reasonable prevailing party attorney's fees. 29 U.S.C. § 216(b).

85.     Plaintiffs are entitled to a declaratory finding that the liquidated damages provisions in their respective Contracts are unenforceable and violate the FLSA on its face and as implemented.

WHEREFORE, Plaintiffs request judgment against Defendants, jointly and severally and seek the following relief:

        A.      Unpaid regular wages and overtime;

        B.      Unreimbursed expenses;

        C.      Liquidated damages under the FLSA;

        D.      Reasonable attorney's fees and costs;

        E.      Pre and post-judgment interest; and

F.      Such other relief as is authorized.

## COUNT TWO
## MARYLAND WAGE PAYMENT AND COLLECTION LAW
(Failure to Pay "Wages")
(All Defendants)

86.    Plaintiffs incorporate by reference all allegations and paragraphs contained in the Complaint as if more fully set forth herein.

87.    At all times relevant to this Lawsuit, Defendants were "employers" and Plaintiffs were "employees" within the meaning of the Maryland Wage Payment and Collection Act ("MWPCL").

88.     Defendants violated the MWPCL by failing to pay all "wages" to Plaintiffs for the work they performed before the termination of employment, on or before the day on which the Plaintiffs would have been paid the wages if their employment had not been terminated.  MD. CODE, LAB. & EMPL § 3-505(a).  Defendants also violated the MWPCL by not paying expenses, which reimbursement qualifies as "wages" under the MWPCL.

89.    At the time of their respective separations, Plaintiffs performed work on behalf of Defendants and were entitled to and had, in fact, earned the full value of their earnings.

90.    Defendants willfully violated the MWPCL.  As noted throughout this Complaint, Plaintiffs were deliberately not paid earned wages, overtime and expenses as alleged herein, and which can be further supported upon a review of Defendants records and at the trial of this action.  The refusal to pay such earnings was not the result of a bona fide dispute, and Plaintiffs are entitled to treble damages in an amount not exceeding three times the unpaid wages, as well as pre and post judgment interest, reasonable attorney's fees, and other costs. MD. CODE, LAB. & EMPL § 3-507.2(b).

19

WHEREFORE, Plaintiffs request judgment against Defendants, jointly and severally, and seek the following relief:

        A.      Unpaid regular wages and overtime;

        B.      An amount of three times the wage;

        C.      Reasonable attorney's fees and costs;

        D.      Pre and post-judgment interest; and

        E.      Such other relief as is authorized.

### COUNT THREE
### QUANTUM MERUIT
(Defendant NMT - Common Law)

91.      Plaintiffs incorporate by reference all allegations contained in all paragraphs of the Complaint as if more fully set forth herein.

92.      Alternatively, Defendants had a quasi-contractual obligation to compensate Plaintiffs with the value of all wages, benefits, and unreimbursed expenses that were due to them as employees of NMT because of their employment, and Plaintiffs conferred benefits upon NMT by working on their behalf.

93.      NMT had an appreciation or knowledge of the benefits conferred upon them by Plaintiffs.

94.      Despite the foregoing, NMT retained the value of the wages, benefits, and unreimbursed expenses under circumstances that makes it inequitable for NMT to retain the value of these benefits.

WHEREFORE, Plaintiffs request judgment against Defendants, jointly and severally, and seek the following relief:

        A.      Unpaid regular wages and overtime;

B.      Unreimbursed expenses; and

C.      Such other relief as authorized.

## COUNT FOUR
## TRAFFICKING VICTIMS PROTECTION ACT
(All Defendants)

95.     Plaintiffs incorporate by reference all allegations contained in all paragraphs of the Complaint as if more fully set forth herein.

96.     Defendants knowingly obtained the labor or services of Plaintiffs by threats of serious harm or by means of the abuse or threatened abuse of law or legal process in violation of the TVPA.  18 U.S.C. § 1589(a)(2)-(3).

97.     Defendants and its agents knowingly benefitted financially and received value for participation in the scheme.

98.     Defendants and its agents knowingly recruited Plaintiffs for labor and/or services in violation of the TVPA.

99.     Through the abuse of legal process and threats of non-physical harm Defendants sought to compel Plaintiffs to remain employed with Defendants and have brought lawsuits against them and/or threatened to do so.

100.    Defendants actions were willful, with the design to oppress, subjugate and coerce Plaintiffs.

WHEREFORE, Plaintiffs request judgment against Defendants, jointly and severally, and seek the following relief:

A.      Compensatory damages;

B.      Punitive damages; and

C.      Such other relief as authorized.

**COUNT FIVE**
**DECLARATORY RELIEF**
(Declaratory Judgment Act, 28 U.S.C. §§ 2201)
(Maryland Uniform Declaratory Judgment Act, MD. CODE ANN, CTS. & JUD. PROC. §§3-401)
(Defendant- NMT)

101.    Plaintiffs incorporate by reference all allegations contained in all paragraphs of the Complaint as if more fully set forth herein.

102.    A present, actual and justiciable controversy exists between the Plaintiffs and NMT as to the enforceability and unconscionability of the liquidated damages provisions contained in the respective Contracts between Plaintiffs and NMT.

103.    Given the pendency of the District Court lawsuits in Howard County, future injury to the Plaintiffs loom with a high degree of immediacy.

104.    Without a declaration, the parties cannot know their rights, status, obligations and legal relations on a go-forward basis.

105.    All of the parties necessary to the adjudication of the existing controversy are before the Court.

106.    Declaratory relief is appropriate pursuant to 28 U.S.C. §2201, and MD. CODE ANN, CTS. & JUD. PROC. §§3-401, *et seq.*

WHEREFORE, Plaintiffs seek a declaration that:

A.    The repayment and liquidated damages provisions in the Contracts are unenforceable because, at a minimum: (i) the damages sought, if judgment were obtained and collected, would result in Plaintiffs earning zero pay for several months of work in violation of the FLSA, MWHL, MWPCL and TVPA; (ii) the repayment and liquidated damages provisions at issue are against the public policy of the State of Maryland; (iii) the repayment and liquidated damages provisions –in light of Plaintiffs being young, entry

       level employees with no meaningful bargaining power –are a contract of

       adhesion and/or are unconscionable;

B.      Defendants' attempt to seek payment from Plaintiffs is illegal;

C.      Defendants' scheme violates the FLSA, the MWPCL, and the TVPA;

D.      Defendants attempt to seek payment from at-will employees and

       liquidated damages or attempt to recoup wages paid violates the principle

       of at-will employment.

E.      Defendants owe Plaintiffs unpaid wages and overtime;

F.      Defendants violated the FLSA, MWHL, MWPCL and the TVPA;

G.      Such other declaratory relief as warranted under the circumstances of this

       Lawsuit.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs demand a trial by jury in this action.

       Respectfully submitted

     By: _____/s/_____
       Ruth Ann Azeredo (MD 16175)
       Law Office of Ruth Ann Azeredo LLC
       1997 Annapolis Exchange Parkway
       Suite 300
       Annapolis, Maryland 21401
       Tel: (410) 558-1915
       Fax: (410) 558-19177
       ruthazeredo@comcast.net7

       -and-

       Timothy W. Romberger
       Fed. Bar No. 014408
       1025 Connecticut Avenue, N.W.
       Suite 1000
       Washington, D.C.  20046

(202) 248-5053
timromberger1@comcast.net
Attorneys for Plaintiff

Dated:  September 9, 2021